W. H. Easley, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Margaret A. Easley, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 6287, 6288.   Promulgated January 27, 1947.

*Clyde C. Sherwood, Esq.,* and *John V. Lewis, Esq.,* for the petitioners.

*E. A. Tonjes, Esq.,* for the respondent.

154

160

OPINION.

HARRON, *Judge*: The general question is whether, under section 22 (a) of the Internal Revenue Code, the entire income of the business known as Seven-Up Bottling Co. of San Francisco is taxable to petitioners. Petitioners contend that one-half of the income is taxable to two trusts.

Petitioners' contention is founded upon the claim that they conveyed to the trusts one-fourth interests in the business which petitioner W. H. Easley conducted as a sole proprietorship. The first question, therefore, is whether petitioner did effect transfers of interests *in the business*, the income of which is subject to tax. In the consideration of this question the nature of the business and Easley's relation to it are examined first. The facts relating to transfers of property to the trusts are considered thereafter.

*The nature of the business:* The heart of the business was the grant by the St. Louis company of a sales territory to Easley. He received an exclusive license to sell the product called 7–Up within several counties, which was given under a written contract. Without the contract there could not be any business operations. After the contract was obtained the business depended upon selling the product. The demand for the product had to be created. The beverage had competitors in the class of a bottled soft drink selling for 5 and 10 cents. The demand for 7–Up was a variable that responded to advertising the product and to the efforts of selling to and supplying retailers. The product was standardized and made up according to ingredients and the formula of the St. Louis company. The product was, for practical purposes, a ready-made item. The St. Louis company had arrangements with the makers of the bottles so that the design was established. The making of the beverage in a bottler's plant was standardized. All of this left as the prime function of the bottler and distributor the work of selling the beverage. The retention of a sales territory by a bottler depended upon his success in selling the product widely and in substantial quantities. Adver-

tising was part of the success of sales. Service to retailers was, no doubt, another important factor. And, since the product was sold by retailers to the public, another factor must have been reaching as many retailers in a sales territory as possible. A sales organization plus the contract giving a territory determined the size and existence of the business. In the taxable period, cash of $50,000 to $75,000 was required to operate the business. Plant and bottling equipment, although required, was utilized in proportion to the volume of sales. It follows that the value of physical equipment as a factor in producing income was considerably less than the good will represented by customers, which, in turn, depended upon selling efforts. And, without the contract with the St. Louis company, the physical equipment of the bottling plant was not the prime factor in producing income; and its value would be only its market value.

*Easley's relation to the business:* Easley was given the sales territory and the license to sell within it because of his ability to sell and to build up a sales organization. He started the business with the small capital of $500. He built up a very profitable business having a substantial volume of sales through his personal skill in advertising, selling, and distributing the product. The contract with the St. Louis company was made with him personally. While the matter of assigning the contract did not arise in the taxable period before us, and it appears that the policies of the St. Louis company may not have been clear at that time on this point, it was clearly understood in 1934 that Easley was given a sales area because of his ability to build a sales organization, and in 1943 the St. Louis company clearly specified that the territory agreement could not be sold, assigned, or transferred except with its written permission. Easley managed the business, determined its policies, developed the territory, and controlled all of the aspects of the business. He directed the advertising and made the advertising contracts. He operated the business as a sole proprietorship. He was efficient in developing an organization and then directing it so that the business went along in the later years, the years in question, without his constant personal service. His success in developing a good organization reduced his own hours of personal attention. But, nevertheless, he alone managed and directed the business. Without him, the business would not go on. The contract from the St. Louis company was one with him personally. It is unimportant, therefore, that in the taxable period he devoted only half of his time to the business. The business depended upon him and his ability to keep the territory contract with the St. Louis company.

*The alleged transfers of interests in the business of two trusts:* Easley did not purport to assign any interest in his territory contract to the trusts, and no mention thereof is made in the trust agreements.

The trusts received no interest in the territory contract with the St. Louis company under the grant to the trustee of the trusts. The grant to the trustee was limited to an undivided interest in the real estate and plant and other physical equipment which was listed, and in inventories, accounts receivable, and notes receivable of a total stated amount of $24,979.73. There is no evidence that any change of record was made in the title to the real estate described in the trust agreements, and the record indicates that no change of record was made. The business required from $50,000 to $75,000 cash for its operation and had about $88,232 in bank before the trust instruments were executed. Easley transferred the cash of the business to a personal account. The trust agreements state that the settlors grant "an undivided one-fourth interest in and to that certain business conducted by the Settlors under the name of Seven Up Bottling Company of San Francisco," and "That said business consists of the following assets and liabilities," namely, the real estate and building, equipment, and notes, accounts and inventories. Thus the first broad reference to the 7–Up business is at once qualified by the description of what the business consists. When the terms of the trust are scrutinized, it is obvious that petitioners did not make a bona fide grant of interests in the existing business, but made only a grant of an interest in some of the real and personal property which were part of the assets of the business, omitting a transfer of any interest in $88,232 of cash and of any interest in the contract which was the heart of the business. In fact, the gross value of the business in operation was far in excess of $82,164, the net value referred to in the trust agreements. The value of an established going concern had to include the cash asset, the value of the good will represented by the list of customers in a fairly large area, and the value of the territory contract. Undivided interests in such assets were not transferred to the trusts, and no reference at all was made in the trusts to them.

Also, while Easley purported to take into the existing business his two minor sons, through the instrumentality of two trusts of which he was the trustee, he did not make any agreement under which his personal control over the business and the earnings of the business was restricted in any way. For example, he did not restrict his power to use the earnings of the business in any way he saw fit; he had unlimited right to withdraw the earnings of the business through his personal drawing account in any amount; his withdrawals were not limited to a salary for his services. Under the trust agreements, the trustee was empowered to do all things in relation to the "trust fund" that would be done if the trust agreements had not been executed. For respective periods of 30 and 32 years, the trustee did not have to distribute any trust income to a beneficiary. The trustee could *collect*

the trust income "as expediency may require." Taking together these factors, the absence of any restriction of Easley's control over the income of the business and of his power to withdraw or use such income as he saw fit, plus the power given to him in the trusts to deal with the "trust fund" in the same way that he could if no trusts were created, plus his discretion to collect income for the trust or not as "expediency" might indicate, plus the absence of the right of the trust beneficiaries to receive any income from the trusts until they were 35 years old, it can be concluded, only, that the creation of the trusts did not bring about any change in the relation of Easley to his established business, and did not bring about any change in the economic status of Easley or his wife.

According to the adjustments made by the respondent, the earnings of the business for the entire year 1940 were $140,483, and for 1941, $171,723. The earnings for the last three months of 1940 were $39,544. These earnings were from sales and they were the result of sales efforts and of the territory contract. The property described in the grant clause of the trusts did not produce these large earnings. The facts must inevitably take us to consideration of the doctrine of *Lucas* v. *Earl*, 281 U. S. 111, and *Burnet* v. *Leininger*, 285 U. S. 136, upon which respondent relies. Income is taxable to the person who earns it. Here, the insulation of a corporate entity does not surround Easley or the business he conducted. And he did not, in the trusts or by any agreement apart from the trusts, insulate himself from the entity of the business in any way; as, for example, by limiting his control over earnings to a fixed salary and by appointing some stranger to his enterprise as trustee for his minor children. No capital accounts were opened for the trusts, although such alone would not change the situation. The conclusion is that petitioner could not have a split personality for tax purposes, having the status of a coadventurer with himself in conducting a personal service business for himself as a taxpayer, and for trusts as taxable entities. The income of his business was not attributable in substantial part to property in which Easley could assign undivided interests in trust to his children.

Taking into consideration the nature of the business involved, the relation of the territory contract to the business, and the relation of Easley to the business, it is concluded that petitioners did not make bona fide transfers of undivided interests *in the business,* an established and going concern, to the trusts. At the most, petitioners made transfers only of interests in the plant, the bottling equipment, and some accounts receivable which were of little importance because most of the product was sold for cash. We hold that the grants in the trusts were ineffective to transfer interests in the business to the

minor children in trust. The question relates to taxation of the income of the business. Since interests in the business were not effectively transferred to the trusts, the entire income of the business for the years 1940 and 1941 is taxable to petitioners. The creation of the trusts was no more than an abortive attempt to make the minor sons of petitioners joint venturers with them in the conduct of a business which was a personal enterprise of Easley. Such attempt had no business purpose; it was an arangement by which the income of a successful business was to be reallocated within the family group. That which was done can not be given effect for purposes of the income tax.

Petitioners point out that they filed gift tax returns in 1940 and paid deficiencies in gift tax. The fact that respondent took the position that gift tax was due and the fact that gift tax was paid does not relieve petitioners from their liability for income tax on the income of the business itself. If the respondent has taken inconsistent positions with respect to the gift tax and the income tax liability of petitioners under the facts in these proceedings, that alone can not be determinative of the question at issue here.

Respondent's determination is sustained.

*Decision will be entered for the respondent.*